```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  )  No. 20-CR-812-LAB
                                      )
 6            v.                      )  October 21, 2020
                                      )
 7   MATTHEW JOHN ANDERSON,           )  1:05 p.m.
                                      )
 8        Defendant.                  )  San Diego, California
     _____ )
 9

10                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE LARRY ALAN BURNS
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  JEFFREY HILL, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
     For the Defendant:      SEVENS LEGAL APC
16                           By:  ALEXANDER H. FUQUA, ESQ.
                             3555 Fourth Avenue
17                           San Diego, California  92103

18

19   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
20                           333 West Broadway, Suite 420
                             San Diego, California, 92101
21                           cynthia_ott@casd.uscourts.gov

22

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA, OCTOBER 21, 2020, 1:05 P.M.

2                              * * * *

3          THE CLERK:  Calling number 18 on the calendar,

4   20-CR-812, United States of America versus Matthew John

5   Anderson.

6          MR. FUQUA:  Good afternoon, Your Honor, Alexander

7   Fuqua on behalf of Mr. Anderson who is present and seated to my

8   right.

9          THE COURT:  Okay, Mr. Fuqua, Mr. Anderson.

10         MR. HILL:  And good afternoon, Your Honor, Jeff Hill

11  for the United States.

12         THE COURT:  Good afternoon.  This matter has been

13  postponed a couple of times, what's the status of the

14  restitution payments?

15         MR. HILL:  If I may, Your Honor, first off, I

16  apologize for being a few moments late.

17         At 12:51 p.m. I received a call from the victims

18  attorney, Barbara Howe Murray, who informed me that there would

19  be an issue with them accepting -- there are two -- as we

20  discussed on Monday, there are two payments that were

21  contemplated being made, one for $64,682.86 and a second for

22  97,000.

23         The $97,000 contribution, the zoo informed me is

24  coming about through a 401(k) disposition that the zoo because

25  they have fundamental doubts about the nature of the

1   explanation given for the withdrawal feels that they cannot

2   accept as restitution.  Their 401(k) administrator informed

3   them that the justification for the withdrawal was COVID

4   related which would be a qualifying event.

5          Their position is that because they do not believe

6   that this is actually a COVID related withdrawal that they're

7   on actual notice and they can't accept that money as

8   restitution.

9          So they have asked me to inform the Court that while

10  they have no problem accepting the restitution, the 64,000 plus

11  tronche, which does not seem to implicate any 401(k) problem,

12  they cannot accept the other payment and as I say, I learned

13  this at 12:51 p.m., and I apologize.

14         THE COURT:  Is the other payment that you referred to,

15  the 97,000 coming out of a 401(k) that's controlled by the zoo?

16         MR. HILL:  The 401(k) in question is administered by

17  the zoo is my understanding because Mrs. Anderson is an

18  employee of the zoo, and, again, because they are on actual

19  knowledge about the nature of the withdrawal.

20         THE COURT:  Why would -- I mean, it strikes me that it

21  could be COVID related in that we have a heightened concern

22  about people in custody getting COVID, and I could see the

23  defendant saying the judge has said this is going to affect his

24  sentencing discretion and it's either going to minimize or

25  avoid my being in a situation that is, may be more likely that

1    I contract COVID.  I mean all that seems rational to me.

2         What business is it of the zoo's?  They're going to

3    deny the opportunity of the employee to pull the money out on

4    an explanation like that?

5         MR. HILL:  Your Honor's opining is very similar to the

6    conversation I had.  All I can say is that I was informed that

7    they would not accept that payment.

8         THE COURT:  Well, that's up to them.

9         MR. HILL:  I agree.

10        THE COURT:  I think the defendant has complied with

11   what he said he was going to do and made that available.

12        I think that there is a reasonable explanation for how

13   this does relate to the COVID pandemic and I'm prepared to

14   accept it.

15        So Mr. Fuqua, I'm happy to hear anything else that you

16   have.  Let me verify again that nothing else has been filed in

17   writing.

18        MR. FUQUA:  Nothing else has been filed in writing.

19        THE COURT:  All right.

20        MR. FUQUA:  Thank you, Your Honor.  Just briefly, my

21   office is in receipt of those two checks, they are in our

22   account waiting for the checks to clear to be wired to the zoo.

23        THE COURT:  Okay.

24        MR. FUQUA:  With respect to that, Your Honor, this is

25   Mr. Anderson's day for sentencing.  He has done everything he

1    can by refinancing his house and asking his wife to contribute

2    to making restitution.  In doing so, they have really put

3    themselves in a sense where financially they're not going

4    to -- it's going to be difficult for them financially should

5    Mr. Anderson go into custody.

6          I am asking that if the Court is going to impose a

7    custodial sanction that it impose an alternative such as home

8    confinement for Mr. Anderson in the sense that he has, he has

9    gainful employment at this time.

10         Mrs. Anderson does not make enough to -- really to

11   survive with the mortgage, a car payment and taking care of

12   their 14-year-old son.

13         With Mr. Anderson's contribution through his

14   employment, they will be able to survive.  Mr. Anderson is

15   facing immigration consequences because of this plea.  He is a

16   citizen of the United Kingdom, and he has certainly been in

17   touch with an immigration attorney to work with the immigration

18   courts on his status here.

19         By nature of this plea, the amount of money as well as

20   the custodial sanction imposed will have consequences for his

21   immigration status.

22         So with that, Your Honor, we are asking that the Court

23   consider home confinement in lieu of actual custody.  Also

24   related to COVID-19, Mr. Anderson while not that old, he's 50,

25   Your Honor, he's not a spring chicken by any means, so I would

1    ask the Court to consider his age before imposing custody as

2    well.

3              THE COURT:  Mr. Anderson, you have a right to speak

4    today and to tell me anything you want me to know.  I'm happy

5    to hear from you.

6              THE DEFENDANT:  Thank you very much, Your Honor.  I

7    felt like the letter I wrote to you didn't explain enough about

8    my remorse of the situation.  This has been three plus years in

9    the making.  I am dreadfully, dreadfully sorry about what I

10   did.

11             I wanted to make it clear on behalf of myself and my

12   family that I made a huge mistake without any question.  And I

13   would really like you to take into account the fact that I've

14   been tutoring my son in your discretion.

15             THE COURT:  All right.

16             THE DEFENDANT:  Thank you for your time.

17             THE COURT:  Thank you.  On behalf of the United

18   States.

19             MR. HILL:  Yes, Your Honor.  I appreciate

20   Mr. Anderson's comments today.  I believe the Court had noted

21   on the record at the initial sentencing when the Court

22   indicated that it would be imposing 18 months that there had

23   been a lack of real remorse or any expression thereof.  So it

24   is nice to hear that.

25             Nonetheless, the United States remains of an opinion

7

1  that a custodial period is appropriate in this case as Your

2  Honor indicated there would be.  The payment of restitution,

3  regardless of this final hiccup, we are at a place where we'd

4  be asking the Court to impose the full restitution amount and

5  reflect at this point that $75,000 of that has actually been

6  paid to the victim.

7         We'll accept counsel's representation that the

8  remaining $161,682.86 will be wired from his client trust

9  account to the zoo.

10        THE COURT:  Wait, clarify for me, I thought the zoo

11  had accepted or had agreed to accept one of the two checks, the

12  $62,000 check already.

13        MR. FUQUA:  There have been three payments so far,

14  Your Honor.  When we were here for sentencing originally, that

15  day I had received a check for $75,000 from Mr. Anderson which

16  came from the refinance of his house.

17        THE COURT:  Right.

18        MR. FUQUA:  And that has been transferred and wired to

19  the zoo already.  Then there's the two remaining checks that we

20  received just a short time ago, one for 97,000 and the other

21  for 64,682.86.

22        THE COURT:  So the latter one I had understood you to

23  say there wasn't a problem with that, that the holdup was the

24  second check that you mentioned because of the 401(k) issue the

25  zoo perceives.

1              MR. HILL:  Correct.

2              THE COURT:  So why don't your restitution figures give

3    him credit for the 64,000 on top of the 75,000 that was already

4    paid?

5              MR. HILL:  Because as we sit here at this moment it is

6    not in possession of the zoo, it's in his client trust account

7    waiting to be sent.

8              THE COURT:  Why wasn't that sent?

9              MR. FUQUA:  The bank informed us the checks need to

10   clear.  So it's there.

11             THE COURT:  They have physical possession of the

12   check?

13             MR. FUQUA:  Oh, yes, I have the receipts.

14             MR. HILL:  Those were provided.

15             THE COURT:  Well, I don't have any question that the

16   check will clear, do you?

17             MR. HILL:  No.

18             THE COURT:  There's bigger problems if it doesn't.

19             MR. HILL:  Right.  And for today's purposes, Your

20   Honor, I'm simply asking that it be reflected that $75,000 has

21   been paid and that if the Court wishes to direct in the order

22   that the remainder be paid in the next week.

23             THE COURT:  I don't understand, does the zoo face some

24   liability if they say, look, this fellow has been told by the

25   judge that the full payment of restitution will affect the

9

1    judge's sentencing discretion.  He faces, under guidelines

2    previously calculated, up to 18 months if he gets a guideline

3    sentence.

4          He wants to take the judge at his word.  He wants to

5    avoid jail at this time because we're still in the midst of a

6    pandemic.  That certainly has COVID related implications to it.

7          Now, if the jail -- or excuse me, if the zoo says

8    well, we're not going to accept that, that's on them.  I mean I

9    have the -- my sense is that Mr. Anderson has done exactly what

10   was asked of him and, you know, I don't understand why the

11   zoo's gotten uppity about taking this -- this other money.

12         Is there some legal implication for the zoo if they

13   release this money?  It would seem to me that the release of

14   the money on a stated basis, I imagine Mrs. Anderson had to put

15   something in writing to say here's the reason I want this and

16   it would be back on her for penalties and interest if the IRS

17   determines it's not a proper use of the money or that the

18   excuse doesn't fit into, you know, one of the recognized

19   excuses.  Doesn't seem to me to be on the zoo.

20         I mean, they wouldn't have to pay the IRS the money

21   back.  They'd come back to Ms. Anderson and say put the money

22   back in or, you know, you'll have a penalty or a tax or

23   something like that, right?

24         MR. HILL:  Everything that you have just said is --

25         THE COURT:  Yeah.

1        MR. HILL:  -- as far as my understanding.

2        THE COURT:  Why wouldn't I find then that the

3   restitution has been fulfilled at this point?

4        MR. HILL:  Well --

5        THE COURT:  If the zoo doesn't want to take it, that's

6   on them.  I can't impose additional burdens on Mr. and

7   Mrs. Anderson.

8        MR. HILL:  I understand.  The point of what I was

9   asking for the $161,682.86 as the outstanding balance is just

10  because it is accurate at this moment the victim has not been

11  paid that money.  I agree with what you're saying --

12       THE COURT:  I'm not sure that it is accurate.  They

13  have been paid that money.  They just don't want to accept one

14  of the two checks.  Neither has been sent to them at this

15  point.

16       Wait, wait.  I thought you said that they're in actual

17  possession of the checks.

18       MR. FUQUA:  We are in actual possession of the checks

19  in my trust account.

20       THE COURT:  Oh.

21       MR. FUQUA:  Both checks.

22       THE COURT:  Why haven't the checks been sent to the

23  zoo?

24       MR. FUQUA:  Because the bank put a hold on them and it

25  needs to clear, so it takes a couple days for that clearance to

1    happen in order to get wired.

2            THE COURT:  You represent -- why isn't this wire

3    transferred?

4            MR. FUQUA:  It is through a wire transfer.

5            THE COURT:  Oh, okay.  You represent that's ongoing

6    right now?

7            MR. FUQUA:  I represent that the bank we use which is

8    essentially a credit union, California Bank & Trust has the two

9    checks, the 64 and change and the 97 in an account right now

10   ready to get wired once the checks clear.

11           So California Bank & Trust put a hold in order for the

12   checks that they've received, the cashier checks, to clear the

13   issuing institution's accounts.

14           THE COURT:  All right.  I'm satisfied, aren't you,

15   based on representations of an officer of the Court that the

16   payment is being made now?

17           MR. HILL:  If the Court is comfortable with that, I am

18   comfortable with that.

19           THE COURT:  He's in big trouble if he misrepresents

20   something to me.  I have no reason to believe he would.  He

21   strikes me as an honest forthright lawyer.

22           MR. HILL:  The -- and I have no disagreement with that

23   either.  It is -- it is a pleasant surprise at this late date

24   that restitution has been made.

25           THE COURT:  No, I agree.

1          MR. HILL:  It is unfortunate that it came down to the
2    wire as it did.

3          THE COURT:  Well.

4          MR. HILL:  And I apologize, again, for being late this
5    morning because of that late -- or this afternoon because of
6    the late-breaking information from the victim.

7          THE COURT:  That's okay.

8          MR. HILL:  But they are in the position of having
9    already allowed the withdrawal.  Their position is simply that
10   accepting it may be problematic.  I agree that is beyond our
11   purview but --

12         THE COURT:  I think it's beyond theirs too.

13         MR. HILL:  It may well be.

14         THE COURT:  What do they care where the money is
15   coming from?  As I said, it seems to me that if there's a
16   problem with withdrawing the money from 401(k) it's a problem
17   for the Andersons, not the zoo, right?

18         MR. HILL:  I don't disagree.

19         THE COURT:  Okay.

20         MR. HILL:  So to close out my comments, Your Honor,
21   when the -- when the Court initially imposed or pronounced
22   sentence, the Court indicated that restitution would make a
23   difference and certainly it is significant to the victim,
24   having spoken with the victim prior to this morning, I know
25   that they still feel that a custodial period is appropriate.

1        The United States also feels that a custodial period

2   is appropriate here.  We stand by the eight month

3   recommendation in our papers.  We think that that is a

4   necessary and minimum sentence to serve as notice as

5   articulated in our papers previously filed to anybody in the

6   position that Mr. Anderson was who might consider trying to

7   divert funds and it is necessary to send that message to the

8   public.

9        On that, I'll submit.

10        THE COURT:  All right.  Thank you.

11        The Court is required to correctly calculate the

12   guidelines as the first step in the sentencing process.  All

13   parties agree that the base offense level for the offense to

14   which Mr. Anderson pled guilty is a 6, because the actual loss

15   exceeded -- excuse me, $150,000, there's a 10-level upward

16   adjustment which takes this to a 16.

17        The Court determined at the first sentencing hearing

18   that this was an abuse of private trust, that Mr. Anderson was

19   in a position where he was akin to a fiduciary, if not an

20   actual fiduciary, and he used his management position in the

21   trust that that included, which meant overseeing funds of the

22   zoo and it was abuse of that trust to do what he did.

23        So the Court finds a two-level upward adjustment

24   should apply there.  The adjusted upward offense level is an

25   18.  Mr. Anderson has accepted responsibility, three come off

1    for that.  The government has asked me to consider and the

2    defense a variance of two levels under fast track and the

3    combination of factors.  And you explained to me, explain to me

4    again what the other factors are.

5          MR. HILL:  Your Honor, other than the waiver of

6    indictment during the period of COVID.

7          THE COURT:  Yeah.  Why isn't that covered by fast

8    track?

9          MR. HILL:  Well, as I articulated perhaps inartfully

10    last time because this is a fraud case, Your Honor, there is

11    no -- the office's position is that fast track does not apply

12    to that.

13          THE COURT:  It's not foreclosed as a matter of law.

14          MR. HILL:  No.

15          THE COURT:  It's just your office's position?

16          MR. HILL:  Correct.

17          THE COURT:  The Court grants a two level fast track

18    departure, so from 18, five come off which makes this a 13.

19          Mr. Anderson has no criminal record.  He's in criminal

20    history category I.  And the Court finds that the guideline

21    range is 12 to 18 months.  Mr. Fuqua has asked for an

22    additional combination of factors departure, the Court declines

23    to depart on that basis, although I will consider the arguments

24    made in support of that requested departure as arguments also

25    for a variance.

1          So keeping in mind the guideline range, 12 to 18

2    months, I now turn to the 3553 factors.  What I find

3    aggravating about this case is not only that Mr. Anderson

4    abused a position of trust but that he did it over the long

5    haul.

6          Mr. Anderson said, you know, this has been three years

7    in the making, referring I think to the controversy coming to a

8    head and resulting in his being in court for a sentencing

9    today.  It's actually, Mr. Anderson, been in the making much

10   longer.

11         The probation reports points out, as you know because

12   you went over it with your lawyer, page four, paragraph eight,

13   that the investigation revealed that you've conducted similar

14   fraudulent activity going all the way back to December of '08

15   and 2010 by purchasing $78,000 worth of equipment from

16   Teknikala, a United Kingdom based company.

17         And then I think using that equipment yourself or

18   giving it, letting a friend have it.  In any event, the

19   fraudulent activity started even before the more recent

20   activity.

21         And the other aggravating thing about it is that this

22   wasn't one, you know, discrete lapse of judgment, it was

23   continuing conduct on your part.  It was each, you know, each

24   new misappropriation of money was a conscious decision by you

25   to take money that you knew didn't belong to you and to try to

1  disguise those transactions so that they wouldn't be found out.
2  And I find that to be aggravating.

3          Now, on the other side of the coin, Mr. Anderson is
4  married, grounded.  One thing to say he's been employed all
5  along, he has.  Unfortunately, there's a blemish on his
6  employment record based on the misappropriation of money and
7  taking advantage of his employer.

8          I think he is remorseful.  I did mention at the first
9  one that the initial expressions of contrition didn't move me
10 very much, but he's come around.  And then, you know, I can't
11 ignore the fact that in fairly short order he, you know -- he's
12 leveraged everything he has, from, you know, the mortgage on
13 his house, to his wife's 401(k), to other savings and it's put
14 him in a bit of a bind.

15         He's a dutiful father.  I accept all of that.  So I'm
16 not going to base the decision here, Mr. Anderson, on just the
17 mistakes that you made over a period of time.  You have
18 equities too and I recognize those, including your family
19 support.

20         Restitution has been made in this case.  I said it
21 would affect my sentencing judgment.  But it's not a "get out
22 of jail free" card, it just isn't.  You can't systematically
23 steal money over a period of time and then when you get caught
24 say I'm paying it back and that clears everything, it doesn't.

25         So I understand the position of the zoo that some

1    custody is in order.  The guidelines, of course, require

2    me --the 3553 factors require me to look at, among other

3    things, just punishment, promoting respect for the law.  And I

4    think to impose no custodial sentence at this point would not

5    further either of those objectives.

6         I don't think it's just, as I said, for me just to

7    take the money and say okay, you know, go in peace now.  I mean

8    otherwise he's gotten an interest free loan over a long period

9    of time that one party didn't consent to.

10        I mean, he made it a loan of his own doing by paying

11   it back at this late date and that's just not right.  It

12   violates federal law.  It amounts to a felony.

13        I'm mindful, Mr. Fuqua, Mr. Anderson, that there are

14   immigration consequences to this, which may be great.  If he

15   gets deported from the United States, that's really going to

16   lead to a lot of upheaval, I think.  I don't know if he and his

17   wife and son have a plan going forward if he is deported, but I

18   have that in mind as an additional consequence.

19        Now he brought it on himself.  He brought it on

20   himself and, you know, for that he needs to seek the

21   forgiveness of his wife and his son, but I do recognize that

22   that's a consequence too.

23        Mr. Fuqua has asked me to consider house arrest, home

24   confinement as an alternative.  I acknowledge, first of all,

25   that for some reason the guidelines recognize that as some kind

1    of equivalent to jail.  I don't think whoever came up with the

2    idea though ever talked to anybody in jail.  I lay you odds

3    right now that if we went over to the MCC, housing all those

4    folks and said where would you rather be, here in the jail cell

5    or at your home, that it would be unanimous, that they'd all

6    want to be out of jail.

7         Think about it for a second, it's a ridiculous

8    comparison or equivalency to say being at home is the same as

9    being in jail.  We've heard for years all these adages, a man's

10   home is his castle, there's no place like home.  There's a

11   reason for those sayings, it's because home is a place of

12   comfort unlike the jail, which is not.  Jail is a place of

13   discomfort.

14        This probably is not Mr. Anderson's situation but

15   there was a famous felon who was sentenced to house arrest,

16   Barry Bonds, you may remember.  And here's how he spent his

17   time in punishment.  He lived on about a two acre parcel,

18   Beverly Hills.  The house had seven bedrooms, 14 bathrooms, a

19   music room, theater, wine room, gym, spa, elevator, guest

20   house, Olympic sized pool.  Doesn't sound like jail to me.

21   Doesn't sound like jail to me.  Sounds more like a five star

22   resort.

23        And I think people look at this, I mean if we're

24   talking about promoting respect for the law and we tell

25   somebody to go home, I mean, I can see how that might come up

```
1    with somebody in dire health conditions, somebody very elderly,

2    but otherwise it doesn't make a lot of sense to me and in this

3    case, Mr. Fuqua, with all respect, I reject that as an

4    alternative here.

5           I just don't think it's just punishment and I think

6    rather than promoting respect for the law it really erodes

7    respect for the law when white collar criminals in particular

8    are treated this way and say, you know, go home and pay your

9    penitence there, it just doesn't strike me as correct.  So I

10   reject that suggestion.

11          Now, look, it wasn't an empty sentiment for me to tell

12   Mr. Anderson that I -- my judgment would be affected by the

13   payment of restitution and it has been.

14          I don't know if I was forthright enough to say I think

15   18 months is right, but I did think 18 months was right at the

16   inception of this without any restitution being paid and that

17   would have been the Court's sentence.

18          Mr. Anderson and his wife have moved heaven and earth

19   to come up with the money to pay the zoo back.  And, you know,

20   that partially makes up for what he did.  Doesn't absolve him,

21   but it partially makes up for the harm that he's done and I

22   think, you know, it's up to the zoo.  If they want to take the

23   money, it's there, right?  And it's not their business whether

24   that strictly complies with IRS requirements or not.

25          As I said, the Andersons are going to be on the hook
```

1    for that, Mrs. Anderson, not the zoo, so butt out really.  I'm

2    going to consider that full restitution has been tendered and,

3    you know, if they don't want to take it, it's on them.  It's on

4    them.  But all that said, I do find that Mr. Anderson is

5    entitled to some sentencing consideration.

6          This does not flow from the white collar nature of the

7    crime.  Doesn't flow from the other equities, but this flows

8    directly from his decision and that of his wife to come up with

9    enough money to pay back the amount that he stole.

10          So from the high end, from the high end of the

11    guidelines which is where I was, I'm going to vary down to six

12    months, which I find to be a reasonable sentence.  It's a

13    reasonable penalty and custodial sentence that really reflects

14    some of the more aggravated aspects of this that I mentioned,

15    the duration, the number of discrete thefts, it wasn't a single

16    theft.  All of this didn't go at once.

17          It was a number of discrete thefts over a long period

18    of time, each premeditated, each thought about, each covered

19    up.  And I think, you know, that deserves not just condemnation

20    but a consequence certainly beyond house arrest.  But I am

21    giving you credit, as I said I would.  I've shaved an entire

22    year off of what I would have imposed, Mr. Anderson, because of

23    the payment of restitution.

24          So the sentence here is a variance from both the high

25    end and the low end of the guidelines and the reason is that

 1   the defendant has come around by really making a Herculean

 2   effort to come up with over $200,000 in restitution and I think

 3   that effort should be reflected as I -- as I have done in the

 4   form of a variance.  So the sentence is six months.

 5          Mr. Anderson, thereafter, will be on supervised

 6   release for a period of three years.  In light of the fact that

 7   restitution in the Court's judgment has been tendered in full,

 8   I decline to impose a fine.  I do impose a $100 penalty

 9   assessment.

10          I've signed the restitution order, but as I said, the

11   Court finds -- Mr. Fuqua, make sure that I'm correct on this,

12   the total amount of restitution in the order and in the

13   probation report was $236,682.86.

14          MR. FUQUA:  That is correct.

15          THE COURT:  That's the amount that's been tendered in

16   full?

17          MR. FUQUA:  Yes.

18          THE COURT:  The Court finds that then restitution has

19   been paid.  I'm ordering you to go through with the process of

20   transferring the checks, don't --

21          MR. FUQUA:  Absolutely.

22          THE COURT:  -- stop it and if they don't accept it,

23   like I said, well, oh well, too bad.

24          MR. HILL:  Your Honor, with regard to the restitution

25   order, I believe the restitution order that I proffered

1    previously included some provisions ordering him to dispose of

2    some assets, would you like me to modify it?

3           THE COURT:  I would.  It also says, part 3A, that he

4    shall deposit 75,000, make it reflect that he has tendered the

5    full amount.  And then I'll sign a redone restitution order.

6           MR. HILL:  Thank you.

7           THE COURT:  Let's see.  I don't think they've

8    recommended any other conditions.  I'm not going to require

9    that Mr. Anderson reveal this to potential future employers,

10    unless asked.  If you're asked about this, you've got to level

11    with them and tell them what the circumstances were, but I

12    don't want to give you a poison pill that prevents you from

13    getting employment by fronting this.

14           Obviously, if there's a place on the form to tell them

15    about your criminal record, you must.  And if you're asked

16    about it, you must be honest about this, but he doesn't have an

17    affirmative duty to volunteer any of the information about

18    this.

19           I can't think of any other conditions.  Can the

20    government think of any?

21           MR. HILL:  No, Your Honor.

22           THE COURT:  Here's one, look, it looks like you may be

23    deported for this.  If you are deported, you're not to come

24    back into the United States without official permission of the

25    United States Government.

1          On behalf of probation.

2          PROBATION OFFICER:  Your Honor, David Dilbeck with

3    U.S. Probation.  I take it by the Court's comments that

4    includes not imposing the recommendation number two on page,

5    apologize, 18 of the PSR.

6          THE COURT:  Oh, I'm sorry, I just -- I missed that.

7          Well, I don't know, that's a tougher one, that he not

8    engage in employment which includes fiduciary responsibilities.

9          MR. HILL:  The United States would be requesting that.

10          PROBATION OFFICER:  Your Honor, probation is

11    interested in trying to alleviate any concerns in that realm.

12          As the Court may be aware, not only the position he

13    occupied during the commission of the offense but a position he

14    obtained shortly after being relieved or resigning from the zoo

15    was another directorship type role.

16          We are concerned that those are the types of roles

17    he's seeking.  He may have access to funds and this pattern

18    that was established over a number of years is of concern to

19    probation.

20          THE COURT:  Well, okay.  So I'll impose this condition

21    that Mr. Anderson, if -- if you are reemployed in a profession

22    that includes or touches on fiduciary responsibility, you are

23    to inform the U.S. probation officer about that and whatever

24    inquiries the probation officer makes, as long as they're not

25    vindictive and they wouldn't be, are authorized.

1          He's to report to the probation officer all

2   automobiles he owns.  He's to submit to a search of his person,

3   property, residence and computer by the probation officer, and

4   to provide complete disclosure of his business and financial

5   interests to the probation officer.

6          I don't think I need to put in this business about

7   transferring funds in light of the fact that I found now that

8   he has tendered full restitution, correct?

9          PROBATION OFFICER:  Correct.  We're less concerned

10   with those conditions, Your Honor.

11          THE COURT:  And the Court declines to prevent him from

12   checking accounts, that wasn't the problem here.  So those are

13   the conditions of supervised release.

14          And that'll be for a three-year period.  Anything else

15   then on this matter, Mr. Fuqua?  Any other issues that need to

16   be addressed?

17          MR. FUQUA:  Two things, Your Honor, one, that

18   placement be in the western region and that Mr. Anderson

19   receive a report date.

20          THE COURT:  Well, I'm not inclined to follow the

21   second one.  I don't do that routinely.  It has nothing to do

22   with Mr. Anderson.  Was there a waiver of appeal provision and

23   has it been triggered by the sentence that I've imposed?

24          MR. FUQUA:  There is waiver of appeal.

25          THE COURT:  Yeah, so sentence is now final and, you

1    know, if I were in Mr. Anderson's shoes I would have been

2    sweating this for the last month, right, you go to bed the

3    night before sentencing and you're thinking what's going to

4    happen tomorrow and you get psychologically prepared to come in

5    and hear the verdict and it's been rendered now, 3143 puts the

6    presumption on the defendant to essentially show me some

7    extraordinary reasons why.  So I'm not inclined to do that.

8           I will recommend that he be placed at Lompoc Camp or

9    Terminal Island or as close as possible to San Diego in

10   southern California to facilitate visitation with his family,

11   but the request for a surrender date is -- is denied.  He's to

12   be remanded today.  I'll let him say goodbye to his wife.  His

13   bond is exonerated but he's ordered remanded.

14          Good luck to you, Mr. Anderson.

15          MR. HILL:  Thank you, Your Honor.

16          THE COURT:  And, Mr. Hill, I'll wait for that amended

17   restitution order.

18          MR. HILL:  Within a few hours.

19   (Proceedings concluded at 1:37 p.m., October 21, 2020.)

20

21

22

23

24

25

26

```
1                    COURT REPORTER'S CERTIFICATE

2

3        I, CYNTHIA R. OTT, Official Court Reporter, United States

4   District Court, Southern District of California, do hereby

5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

6   true, complete and correct transcript of the stenographically

7   reported proceedings had in connection with the above-entitled

8   matter and that the transcript page format is in conformance

9   with the regulations of the Judicial Conference of the United

10  States.

11

12        DATED at San Diego, California, March 26, 2021.

13

14                          /s/ CYNTHIA R. OTT
                        CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25
```